cat / div _~~S70/2255/Dawte~~_
Case # _____
Judge _Jordan_ Mag _White_
Motn Ifp _____ Fee pd $ _____
Receipt # _____

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## MIAMI-DADE COUNTY DIVISION

Kent Frank
Fed ID#: 34855-086
Federal Correctional Institution
P.O. Box 7007
Marianna, FL 32447-7007

FILED by _AL_ D.C.

**FEB 1 5 2011**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

United States of America

-vs-

Kent Frank,

Petitioner, Pro Se

# 11-CV-20507-Jordan/White

Case No. _____

Honorable Adalberto Jordan
United States District Judge

## MOTION TO VACATE, SET ASIDE OR CORRECT
## SENTENCE PURSUANT TO 28 U.S.C. § 2255

1. Conviction entered by the United States District Court for the Southern District of Florida, Honorable Adalberto Jordan presiding.

2. Judgment of conviction was entered on July 27, 2007.

3. Petitioner was sentenced to serve thirty (30) years each as to counts 1, 2, 4 & 5; forty (40) years each as to counts 6, 8, & 9; and thirty (30) years as to count 10, all to run concurrent to one another. Additionally, the jury failed to return a verdict as to counts three (3) and seven (7).

1

4. Petitioner was charged with five (5) counts of engaging in illicit sexual conduct in foreign places pursuant to 18 U.S.C. 2423(c); four (4) counts of selling or buying of children pursuant to 18 U.S.C. 2251A; one (1) count of travel with intent to engage in illicit sexual conduct pursuant to 18 U.S.C. 2423(b).

5. Petitioner pled not guilty, and was convicted at a jury trial wherein Petitioner did not testify.

6. Petitioner filed an appeal from the judgment of conviction to the Eleventh circuit Court of Appeals. On March 15, 2010, the Circuit Court denied Petitioner's Appeal and entered its mandate. Petitioner did not file a timely motion for rehearing.

7. Petitioner filed a timely motion for Certiorari review on June 10, 2010. On October 4, 2010 the United States Supreme Court denied Certiorari.

8. On August 23, 2010 Petitioner filed a motion to the Eleventh Circuit Court of Appeals for a writ of Mandamus, requesting that the Circuit Court review the incorrect and inconsistent erroneous application of prevailing law to Petitioner's appellate ruling. Additionally, Petitioner filed a motion for grand Jury transcripts and to unseal the case records. Petitioner has not filed any other post-conviction petitions, applications or motions.

## PRO SE PLEADING AND GROUNDS FOR RELIEF

Petitioner submits that he is proceeding pros se in the instant action, that he is not well versed in legal pleadings and form, and requests that this Honorable Court

construe his pleading liberally and not hold him to the same strict standards as those of an attorney, pursuant to the doctrine set forth in *Haines V Kerner, 404 U.S. 519, 92 S.Ct. 594 (1972).*

Additionally, the Eleventh Circuit with respect to pro se claims in *Sanders V United States, 113 F.3d 184 (11th Cir. 1997)* stated "we have a duty to liberally construe assertions to discern whether jurisdiction to consider petitioner's motion can be found on any legally justifiable basis." Furthermore, in *Gunn V Newsome, 881 F.2d 949, 961 (11th Cir. 1989)* and *Kelog V Ruck, 893 F.2d 189 (11th Cir. 1992),* the court held that; "the courts should not erect unnecessary procedural barriers which pro se litigants will have difficulty summarizing, unless the court is willing to guide the pro se litigant or allow them to skip some of the lesser substantive obstacles."

Petitioner submits that it is well established that submissions of pro se pleadings must be construed "to raise the strongest arguments that they suggest." See: *Pabon V Wright, 459 F.3d 241 (2nd Cir. 2006).* The policy of liberally construing pro se submissions is driven by the understanding that "implicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Ruotolo V I.R.S., 28 F.3d 6, 8, (2nd Cir. 1994).* "In this time of ever increasing legal cost and complexity of litigation, the pro se litigant is at an insurmountable disadvantage." *A Study of the Pro Se Docket, 30 Fordham Urb. L.J 305, 380 (2002).*

3

Petitioner submits that under the Fifth and Sixth Amendments to the United States Constitution, Petitioner was entitled to effective assistance of counsel and due process of law at all the critical stages of his proceedings. Petitioner's trial counsel's representation fell below an objective reasonable standard which resulted in insurmountable prejudice to Petitioner. Additionally, the court rulings denied Petitioner his Constitutional right to confrontation, compulsory process and equal protection under the law. Thus, pursuant to 28 U.S.C. 2255, the court should grant Petitioner's petition to vacate, set aside or correct his sentence and he should be released from federal custody, or in the alternative he should be returned to the position he enjoyed before he received ineffective assistance of counsel. ***Strickland V Washington***, *466 U.S. 668, 687-88, 694-96 (1984).*

Petitioner herein alleges egregious ineffective assistance of trial counsel and gross dereliction of counsel's most basic and essential duties to Petitioner. Among other violations, too numerous to list, Petitioner cites the following instances as examples of trial counsel's ineffective representation: (1) the unreasonable and egregious misadvice of counsel when he advised Petitioner to reject the government's five (5) year plea offer and proceed to trial under the assurance from counsel that if Petitioner were convicted, he would at most be required to do time served; (2) the failure of counsel to call vital witnesses that would have effectively disputed the government's evidence against the petitioner which seriously prejudiced Petitioner; (3) the failure to call vital and corroborating witnesses that would have testified that Petitioner had moved permanently to Asia and was

4

merely returning back home to Asia from a trip to the U.S. to visit his children; (4) trial counsel provided unconstitutional and ineffective representation when he, on numerous occasions, "invited error" by (A) requesting the judge to read the alleged confession to the jury; (B) stipulated to the government's translated version of the alleged confession and allowed it into evidence without contesting its authenticity; (C) allowed the trial judge to change the jury charge after the jury had been deliberating, and in fact actually recommended the revised instruction even though it removed important elements of the charged crime from the jury's consideration; (5) counsel's failure to timely file motions for; (A) the presentation of expert witnesses to refute the government's case; (B) motion requiring the court to permit Petitioner to confront the person responsible for the translation of Petitioner's alleged confession, and the police note taker at Petitioner's interrogation in Cambodia; (C) motion for a bill of particulars which would indicate the government's intentions to alter the required proof at trial for the definition of minor to be changed from age 16 to age 18, and to determine the meaning of the word "purchase" that the government intended to prove; (6) Counsel misinformed Petitioner as to Petitioner's right to testify at his suppression hearing, and to submit to, and introduce polygraph results at the motion hearing to support Petitioner's position that the alleged confession and statements introduced by the government were incorrectly translated and that the statements by Keo Thea were lies; (7) Counsel failed to object to the use of the Tanner scale by the government's witness after the government had assured the petitioner's attorneys that the

government witnesses would not rely on the Tanner scale in their testimony, thereby causing Petitioner's attorneys to withdraw Dr. Tanner as a witness; (8)(A) Counsel failed to object to inflammatory and prejudicial statements made by the prosecutor at closing arguments that were made with the specific intent to inflame the jury; (B) Counsel failed to move for a mistrial when the prosecutor, at opening arguments, told the jury that they would produce alleged victim E, Savanny Ly, during the trial to show that the Petitioner had traveled to Cambodia in 2002 and paid Savanny Ly to have sex with him when she was only fourteen (14) years old, and then failed to produce Savanny Ly at trial; (9) Counsel failed to challenge, at sentencing, the ex post facto application of the enhancements to Petitioner's sentence; (10) Counsel failed to object to the court's jury instructions when the court (A) committed a rule 30 violation, when in the middle of deliberations, it omitted the elements of the crime that the jury was required to find in order to enter a guilty verdict against Petitioner; (B) instructed the jury on two different methods by which they could find the Petitioner guilty without requiring the jury to be unanimous in its finding.

Additionally, Petitioner submits that the court seriously abused its discretion when the court: (1) read the government's and defense attorney's requested jury instructions, to the jury, after they had begun deliberating and amended the terms under which the jury could find Petitioner guilty; (2) sentenced Petitioner under provisions of the sentencing guidelines that did not become law until after the time alleged in Petitioner's indictment in violation of the ex post facto clause of the

6

Constitution; (3) violated the concepts and meaning of Rule 803, 702 and 709 of the Federal Rules of Criminal Procedure; (4) removed the determination of facts, weight of the evidence and reliability from the purview of the jury and thereby prevented Petitioner from presenting his theory of the case, in violation of the Fifth and Sixth Amendment right to due process and a fair trial; (5) at the request of defense counsel and the prosecutor, but without the consent of Petitioner, read the unchallenged government's version of Petitioner's alleged confession and statements by the Cambodian officials; (6) amended the indictment and read it to the jury in the disjunctive when the Grand Jury had twice returned the indictment in the conjunctive, requiring the government to prove purchase, and custody and control in order to convict; (7) allowed the jury to find Petitioner guilty of an offense violation with a minor under 18 U.S.C. 2423(F)(1) or 18 U.S.C. 2423 (F)(2) without insuring that they reach a unanimous decision on one or the other; whereby one requires the minor to be under eighteen (18) and the other requires the minor to be under (16), and there is no way to determine that the jury reached a unanimous decision as to either count; (8) permitted evidence to be introduced by the government concerning Petitioner's arrest in Cambodia; evidence from the Cambodian arrest and search, statements from Cambodian officials and witnesses; without permitting Petitioner to introduce evidence concerning the case in Cambodia, leaving the jury to 'speculate' as to what charges, if any, had been brought against Petitioner three and a half years prior in Cambodia and any

evidence as to Petitioner's guilt or innocence of those charges, thereby seriously prejudicing the Petitioner in the eyes and minds of the jury.

In support of Petitioner's motion, Petitioner submits the following:[1]

## GROUND ONE:

### PETITIONER'S COUNSEL'S REPRESENTATION FELL BELOW AN OBJECTIVELY REASONABLE STANDARD.

Petitioner received ineffective assistance of counsel when:

1) COUNSEL WAS INEFFECTIVE BY VIRTUE OF HIS MISADVICE TO PETITIONER TO REJECT THE PLEA OFFER AND PROCEED TO TRIAL, AND DUE TO A SERIOUS DOUBLE CONFLICT OF INTEREST.
   A) MISADVICE OF COUNSEL
   B) CONFLICT OF INTEREST

2) COUNSEL WAS INEFFECTIVE WHEN HE FAILED TO CALL VITAL WITNESSES TO TESTIFY AT TRIAL CONCERNING EVIDENCE FAVORABLE TO THE PETITIONER.
   A) FOREIGN EVIDENCE
   B) TRAVEL EVIDENCE

3) COUNSEL WAS INEFFECTIVE WHEN HE 'INVITED THE COURT' TO COMMIT SEVERAL CRITICAL ERRORS AT TRIAL.
   A) ASKED JUDGE TO READ CONFESSION.
   B) AGREED TO GOVERNMENT'S FINAL TRANSLATION OF THE ALLEGED CONFESSION.
   C) INVITED RULE 30 VIOLATION OF JURY INSTRUCTIONS.

4) COUNSEL WAS INEFFECTIVE FOR HIS FAILURE TO TIMELY FILE MOTIONS
   A) DR. FERALDO ISSUE

---

[1] NOTE: For the purposes of this motion, the following abbreviations apply: TT refers to Trial Transcripts; ST refers to Sentencing Transcripts; DE refers to Docket Entries in docket sheet; Pg refers to page number; L refers to line number; HT refers to Hearing Transcripts.

B) RIGHT OF CONFRONTATION – TRANSLATOR – POLICEMAN NOTE TAKER.

C) BILL OF PARTICULARS – (16 VS 18).

5) COUNSEL WAS INEFFECTIVE WHEN HE ERRONEOUSLY INFORMED PETITIONER CONCERNING PETITIONER'S RIGHT TO TESTIFY, AND RIGHT TO INTRODUCE POLYGRAPH RESULTS.

6) COUNSEL WAS INEFFECTIVE WHEN HE FAILED TO OBJECT TO THE GOVERNMENT'S INTRODUCTION OF STIPULATED EVIDENCE TO WHICH THE GOVERNMENT HAD AGREED NOT TO PRESENT.

7) COUNSEL WAS INEFFECTIVE WHEN HE FAILED TO OBJECT TO THE PROSECUTOR'S MISCONDUCT AND MOVE FOR A NEW TRIAL.

A) OPENING STATEMENTS.

B) CLOSING ARGUMENTS.

8) PETITIONER'S COUNSEL WAS INEFFECTIVE WHEN HE FAILED TO OBJECT TO THE COURT'S SENTENCING ENHANCEMENTS THAT VIOLATED EX POST FACTO APPLICATION OF THE LAW AND THE GUIDELINES.

9) PETITIONER'S COUNSEL WAS INEFFECTIVE WHEN HE FAILED TO OBJECT TO COURT ERRORS.

---

1-1) COUNSEL WAS INEFFECTIVE BY VIRTUE OF HIS MISADVICE TO PETITIONER TO REJECT THE PLEA OFFER AND PROCEED TO TRIAL, AND DUE TO A SERIOUS DOUBLE CONFLICT OF INTEREST.

A) MISADVICE OF COUNSEL

After Petitioner's first attorney, James Benjamin filed an emergency motion to be dismissed as Petitioner's counsel on March 30, 2006 (DE #85, #86) (Exhibit 24), but prior to Petitioner hiring new counsel Jeffrey Feiler, the government on April 6, 2006 offered Petitioner a Rule 11(c)(1)(C) plea agreement that would require

Petitioner to serve five (5) years in prison and ten (10) years on supervised release, in exchange for the government dismissing all the charges against Petitioner and Petitioner pleading guilty to one count (Count 5), and paying special assessments and a fine. (Exhibit 1, 12 & 23). Petitioner at the time elected to wait until he hired new counsel and had an opportunity to carefully review the government's offer with his new attorney.

After hiring Attorney Feiler, Petitioner asked the advice of Attorney Feiler concerning the government's plea offer, and was told by Attorney Feiler that he (Feiler) believed that the government's case against Petitioner was very weak and that it would be in Petitioner's best interest to reject the government's plea offer and proceed to trial and clear his name. Attorney Feiler also assured Petitioner that even if he proceeded to trial and was convicted, he would likely only receive a sentence of time served. Petitioner, out of caution, had several of his family members and friends contact Attorney Feiler and discuss the ramifications of Petitioner going to trial and losing the case.

Attorney Feiler spoke and met with Petitioner's family and friends and assured them that the government's case was very weak and that even if Petitioner lost the case he would only receive a sentence of time served (Exhibit 2, 3, 4, 5 and 6).

During the course of trial preparations, Petitioner, Petitioner's wife Celia, Petitioner's brother Kevin and Petitioner's friend Mr. Morrison continued to question Attorney Feiler concerning Petitioner's chances and possible exposure at trial. Attorney Feiler remained adamant that the government's case was very weak

and that Petitioner should reject the government's plea offer and proceed to trial. Attorney Feiler at all times continued to assure Petitioner that his exposure would in no event amount to more than time served. As a result of Attorney Feiler's continued misadvice, Petitioner hired additional counsel Joel Berger to assist Attorney Feiler at trial and in preparation for trial in an attempt to insure that Attorney Feiler's prognostications would materialize.

Neither the court, the prosecutor, nor either of Petitioner's attorneys addressed the possibility of Petitioner accepting the plea offer again until it was mentioned buy the court at sentencing. (Exhibit 23).

Had Petitioner been properly advised and made aware of the real exposure he faced with effective representation of counsel, he would have accepted the government's 5 year Rule 11(C)(1)(c) plea offer and not risked the possibility of a life sentence.

Based on Attorney Feiler's advice, Petitioner rejected the government's plea and proceeded to trial. Because of Petitioner's reliance on Attorney Feiler's misadvice, Petitioner was ultimately found guilty at trial and sentenced to serve forty (40) years in prison, eight (8) times greater than Petitioner would have received had he been correctly advised and accepted the government's plea offer.

Counsel's misadvice fell below an objective standard of reasonableness. But for counsels misadvice and incorrect assessment of the penalty Petitioner faced if he proceeded to trial and lost his case, there is a reasonable probability that Petitioner would have elected not to go to trial and would have accepted the government's Rule

11(c)(1)(C) five year plea offer. See: *Turner V Tennessee*, *664 F.Supp. 1113, 1120 (M.D. Tenn) Aff'd 858 F.2d 1201 (6th Cir. 1988), vacated on other grounds, 492 U.S. 902, 109 S.Ct. 3208, 106 L.Ed.2d 559 (1988), reinstated, 726 F.Supp. 1113 (M.D. Tenn 1989), Aff'd 940 F.2d 1000 (1991), cert denied, 502 U.S. 1050, 112 S.Ct. 915, 116 L.Ed.2d 815 (1992); Accord, Johnson V Duckworth, 793 F.2d 898, 900-02 (7th Cir). cert denied, 479 U.S. 937, 107 S.Ct. 416, 93 L.Ed.2d 367 (1986)* (criminal defendant has right to effective assistance of counsel in deciding whether to accept or reject proposed plea agreement); *United States Ex Rel Caruso V Zelinsky, 689 F.2d 435, 438 (3rd Cir 1982)* (decision to reject plea agreement is critical stage at which right to effective assistance attaches); *Beckman V Wainwright, 639 F.2d 262, 267 (5th Cir. 1991)* (incompetent advice to withdraw negotiated plea and proceed to trial violated defendant's Sixth Amendment right). A significant sentencing disparity in combination with a defendant's statement of his intention to accept a plea is sufficient to support a prejudiced finding regarding the misadvice of plea by counsel. *Moss V United States, 2010 U.S. Dist. Lexis 38648 (11th Dist. 2010); citing Phom V United States, 317 F.3d 178, 182 (2nd Cir. 2003).*

The framework for evaluating counsel's ineffectiveness under *Strickland V Washington, 466 U.S. 668, 104 S.Ct. 2052 (1984)* applies to advice from counsel regarding whether to plead guilty. See: *Padilla V Kentucky, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010).* The deficiency portion of the test remains unchanged. Instead of focusing on the fairness of the trial, the prejudice component "focuses on whether

counsel's constitutionally ineffective performance affected the outcome of the plea process." *Hill V Lockhart*, 474 U.S. 52, 59, 106 S.Ct. 366 (1985).

Attorney Feiler's gross misadvice to Petitioner regarding Petitioner's potential prison sentence fell below an objective standard of reasonableness under prevailing professional norms. The fact that Petitioner hoped for a still more favorable plea deal, and attempted to negotiate one, does not mean that Petitioner would not have accepted the government's plea offer. To the contrary, Petitioner's interest in negotiating a plea is further indication that Petitioner was not set on going to trial, and was prepared to accept the plea agreement until advised against it by Attorney Feiler and assured that his exposure would only be a sentence of time served.

The fact that Petitioner, after the misadvice from his attorney, asserted his innocence is not relevant to this Court's determination of the violation of Petitioner's Constitutional right. Factoring in Petitioner's assertion of his innocence would inappropriately punish him for exercising his Fifth Amendment right against self-incrimination. Furthermore, viewing Petitioner's assertion of his innocence as a relevant consideration would be at odds with prior decisions of the courts which clearly establish that it "does not make sense to say that a defendant's protestations of innocence belie his later claim that he would have accepted a guilty plea." See: *Griffin V United States*, 330 F3d 733, 738 (6th Cir. 2003).

Attorney Feiler, before trial, failed to explain to Petitioner the operation of the U.S. Sentencing Guidelines and its applicability to Petitioner's case and the possibility of the ten (10) level enhancement Petitioner received. The court was not

aware of the plea offer and never brought it up until sentencing, far too late for Petitioner to have an understanding of the ramifications of him rejecting the plea offer and proceeding to trial and being convicted. (Exhibit 23).

The Criminal Rules of Procedure require careful monitoring of the process by the District Court in the taking of the guilty plea, however, the Criminal Rules provide in no uncertain terms that the District Court is not to participate in guilty plea negotiations. There is no procedure in place to monitor guilty plea discussions which do not result in a guilty plea, but rather a trial. There are no procedures in place to insure that defendant is given accurate information about the impact of a guilty verdict and the impact of the guidelines in the event of a conviction, except during the process of a taking of a guilty plea. Without the effective assistance of counsel and the correct advice from counsel, Petitioner was left to make the decision based on his attorney's incorrect advice.

The applicable legal standard defines "advice" as providing the client with an understanding of the law in relation to the facts of his case. Attorney Feiler's advice urging Petitioner to proceed to trial and not to accept the government's offer does not constitute such advice.

Attorney Feiler's advice was the deciding factor that motivated Petitioner to reject the offer to plead guilty. Attorney Feiler's misadvice cost Petitioner the opportunity to consider the government's five year plea offer with the constitutionally guaranteed effective assistance of counsel.

"Providing erroneous advice in the face of settled circuit law is deficient performance. Counsel's advice is an unreasonable application of clearly established Federal law if the attorney indentifies the correct governing legal rule from the Supreme Court, but unreasonably applies it to the fact of the particular prisoner's case." *Smith V Mitchell*, *567 F.3d 246 (6th Cir. 2009)*; *Williams V Taylor*, *529 U.S. 362, 120 S.Ct. 1495 (2000)*. Petitioner needs not show that counsel's deficient conduct more likely than not altered the outcome in the case, he need only show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland V Washington*, *466 U.S. 668, 693, 104 S.Ct. 2052 (1984)*.

The *Strickland* framework for evaluating counsel's ineffectiveness applieas to advice regarding whether to plead guilty. *Padilla V Kentucky*, *130 S.Ct. 1473, 176 L.Ed.2d 284 (2010)*; *Hill V Lockhart*, *474 U.S. 52, 106 S.Ct. 366 (1985)*. The deficiency portion of the test remains unchanged. The prejudice component "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *Hill*, @ 59. Petitioner's counsel provided objectively unreasonable advice and Petitioner relied on that advice in rejecting the plea, going to trial, and receiving a much higher sentence. No federal circuit case holds that there is no prejudice from ineffective assistance of counsel where the defendant receives a fair trial, and the courts have consistently rejected such a myopic view of prejudice from a deprivation of the right to effective counsel. *United States V Morris*, *470 F.3d 596 (6th Cir. 2006)*.

Counsel provided erroneous advice that led Petitioner to reject a favorable plea bargain. It was Petitioner's belief based on his meetings with Attorney Feiler at the jail, and his family and friends having spoken with Attorney Feiler, that at the absolute most, he would only be sentenced to time served. Mr. Feiler made an assessment based on his years as a criminal lawyer as to what he believed the government could or couldn't prove and what the government's "weak evidence" could or could not support and he made a 'strong' recommendation to Petitioner to reject the government's plea offer.

"Specific performance" of the plea deal that Petitioner would have taken but for his attorney's ineffectiveness is warranted. But for Attorney Feiler's erroneous advice, Petitioner would have accepted the government's plea offer. *Magana V Hofbauer, 263 F.3d 542 (6th Cir. 2001); Maples V Stegall, 340 F.3d 433, 439 (6th Cir. 2003)* (providing "patently erroneous" legal advice is deficient performance).

Petitioner lost out on an opportunity to plead guilty and receive the lower sentence that was offered to him because he was deprived of his constitutional right to effective assistance of counsel. In this case, it is clear what injury Petitioner suffered. Instead of being sentenced for 5 years of incarceration, he received a sentence of forty (40) years of imprisonment and a fine double that of what the government offered in the plea agreement.

Defense counsel did not fulfill his duty to supply Petitioner with the necessary and accurate information regarding Petitioner's exposure should he proceed to trial. The failure to fulfill this duty deprived Petitioner of the "right to make a reasonably

informed decision whether to accept the plea offer." *Turner supra, 281 F.3d at 880.* This error when reviewed together with counsel's exaggerated optimism of the benefits of going to trial and the misadvice regarding the maximum sentence exposure fell below the objective standard of reasonableness required of attorneys under the constitution. Even applying the strong presumption of competence, Petitioner was deprived by the specific misadvice of counsel of his "right to make a reasonably informed decision of whether to accept a plea offer" *Turner, @ 880.*

It is quintessentially the duty of counsel to provide his client with all available advice and his failure to do so clearly satisfies the first prong of the *Strickland* analysis.

By grossly underestimating Petitioner's sentencing exposure, counsel breached his duty to advise his client fully on whether a particular plea to a charge appeared desirable. Therefore, Attorney Feiler's legal assistance fell below the prevailing professional norms for advising a client. The fact that there was a great disparity between the actual maximum sentencing exposure (LIFE) under the sentencing guidelines and the sentence exposure represented by counsel, provided sufficient objective evidence to establish a reasonable probability that the outcome would have been different.

### B) CONFLICT OF INTEREST

Additionally, Attorney Feiler was seriously conflicted by the fact that he had entered a "contingency fee agreement" with the Petitioner whereby he would only receive a $35,000.00 fee if Petitioner accepted a guilty plea as opposed to the

substantial fee he received by proceeding to trial. Here, the interest of the attorney in proceeding to trial and the interest of the Petitioner in accepting the guilty plea and avoiding a possible life sentence were in serious conflict. See: *United States V Fulton*, 5 F.3d 605 (2nd Cir. 1993); *Winkler V Keane*, 7 F.3d 304 (2nd Cir. 1993); *Daniels V United States*, 54 F.3d 290 (7th Cir. 1995).

Attorney Feiler then proceeded to hire his wife, Attorney Lorie Feiler, and enlisted her services to travel to Cambodia on three separate occasions for the purpose of investigating Petitioner's case as well as interviewing potential witnesses and subsequently bringing them to the United States to testify at Petitioner's trial. Attorney Feiler gave his wife in excess of $100,000.00 in cost, expenses and fees, without authorization from Petitioner and in violation of the retainer agreement between Petitioner and Attorney Jeffery Feiler. When Attorney Feiler's wife failed to produce any results from her trip to Cambodia, Petitioner was compelled to hire additional counsel Michael Walsh, Matthew Troccoli and Pove Srey Sour to complete the required tasks.

These failed events by Attorney Feiler's wife created a serious conflict of interest between Petitioner and Attorney Feiler, and was one of the direct causes of Attorney Feilers failure to call Attorneys Walsh and Troccoli to testify on Petitioner's behalf. The testimony from these crucial witnesses would have unquestionably shown that Attorney Feiler's wife had failed to perform the job she had been paid to do, and created a division between Attorney Feiler's duty to the

Petitioner and his loyalty to his wife. This conflict of interest is clearly reflected in Attorney Feiler's failure to call these witnesses.

Attorney Feiler sent his wife to Cambodia on three separate occasions with no results. Attorney Feiler then attempted to have Petitioner "sign off" on the more than $100,000.00 he had advanced to his wife without authorization. These actions on Attorney Feiler's behalf prevented him from giving Petitioner his undivided loyalty and calling crucial witnesses that would have discredited, and placed his wife in an embarrassing position.

The fact that Attorney Feiler was aware of his wife's ineffectiveness is evidenced by the fact that when Petitioner confronted Attorney Feiler concerning these events, Feiler agreed to pay for his wife's last trip and attempted to resolve the matter in a written communication. Attorney Feiler was seriously conflicted in his representation of Petitioner.

> **1-2) COUNSEL WAS INEFFECTIVE WHEN HE FAILED TO CALL VITAL WITNESSES TO TESTIFY AT TRIAL CONCERNING EVIDENCE FAVORABLE TO THE PETITIONER.**
> **A) FOREIGN EVIDENCE**
> **B) TRAVEL EVIDENCE**

A deficiency in counsel's performance is prejudicial where there is a reasonable probability that, but for the error, the results of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Thus, in the context of a criminal trial, the standard is

whether a jury, absent the error, would have a reasonable doubt concerning the guilt of the accused. *Stano V Dugger, 921 F.2d 1125, 1149 (11th Cir. 1991).*

At trial, and during motion hearings, Attorneys Michael Walsh, Matthew Troccoli, and Pove Srey Sour were prepared to testify on Petitioner's behalf, and were available to dispute and challenge much of the government's case. These reputable, credible witnesses and officers of the court had performed extensive investigations of Petitioner's case in Cambodia and had personal firsthand knowledge of the facts and many of the events that took place in Cambodia. Additionally, these witnesses had interviewed the alleged victims, their parents and others who were directly involved with the facts concerning Petitioner's case, and would have provided relevant and important information that would have greatly assisted the jury with their understanding of the actual facts in the case. The testimony from these witnesses would have challenged much of the government's testimony. In spite of Petitioner's pleadings and the expense of sending and paying for these vital witnesses to travel to Cambodia and investigate the case, Attorneys Feiler and Berger refused to call these important witnesses. Petitioner's attorneys failed to call these crucial witnesses even when the trial judge stated on several occasions that he would like to hear from the Petitioner or other witnesses concerning several matters that had taken place in Cambodia. (TT 3000 L17-18/TT 2845 L5-8).

The failure to call these crucial witnesses was clearly outside the ambit of strategic choices recognized by both *Strickland, supra* and Eleventh Circuit law.

Counsel's failure to call the witnesses cannot be attributed to any strategic or tactical trial decisions, but was due to trial counsel's conflicts between himself and the witnesses, whom Petitioner had hired to investigate the incident in Cambodia, because of Attorney Feiler's and his wife's failure to accomplish the required investigation. These witnesses and their testimony were a vital portion of Petitioner's defense and theory of the case, and would have willingly testified to facts not in evidence at trial. Their testimony would have without a doubt created reasonable doubt as to Petitioner's guilt of the charged offenses, and resulted in a possible different outcome. (Exhibits 7, 8, 9, 10 & 11).

## A) FOREIGN EVIDENCE/PASSPORTS

Attorneys Walsh, Troccoli, and Pove Srey Sour had spent hours investigating the facts concerning Petitioner's case and arrest in Cambodia. "An attorney does not provide effective assistance if he fails to investigate sources of evidence which may be helpful to the defense." *Davis V Alabama, 596 F.2d 1214, 1217 (5th Cir. 1979).* Attorney Walsh traveled twice to Cambodia and interviewed several of the persons involved in Petitioner's case. Attorney Troccoli traveled once to interview potential witnesses, Attorney Pove Srey Sour had known Petitioner for some time, and had assisted Petitioner with his search for business opportunities in Asia and with settling in Asia and beginning his residency requirements necessary for obtaining citizenship in Cambodia. Attorney Pove Srey Sour traveled to the United States and spent several days waiting to be called as a witness in Petitioner's trial, but was never called. These crucial witnesses could have provided the court with much of

the required information that would have permitted the judge to render better informed decisions concerning many of Petitioner's motions and the admissibility of evidence that would have made a vast difference in the outcome of the trial.

Judge Jordan and Judge Klein on several occasions asked Petitioner's attorneys to provide information and/or clarification of the events that took place in Cambodia and how they had unfolded. (TT 2995, L11-20; TT 2845, L5-8)

When asked by the court about what documents were produced to get the passports for the alleged victims, Attorney Feiler provided incorrect information to the court. Attorney Feiler told the court;

> "Well, they don't have any documents, because in that country, you don't have documents. There's no birth certificates, You can take any Vietnamese person who wants to get a passport legitimately, and that person – no person in Vietnam – or probably one percent – 99 percent of the population of Vietnam would not be able to get a Vietnamese passport if they had to present some type of birth certificate…" (TT 2845, L15-22).

Here again we have clear evidence of Attorney Feiler and Berger's failure to investigate and prepare for trial. Vietnamese families are required to keep a "Family Book" which is a record of all family events including births, deaths, and important events. These witnesses could have testified to the fact that the Embassy had required the alleged victims to travel to their homes on two occasions to get the required proof of age before issuing the passports. (TT 2840, L1-4).

The judge asked to hear from these witnesses "outside of the jury's presence" (TT 2993, L15-23; 2994, L18-19). Attorney Feiler not only failed to call these vital witnesses at that time, but in fact eliminated them as witnesses all together. (TT 3096, L16-25).

Additionally, the government was permitted to make unfounded allegations attacking the honesty and character of defense counsel's witnesses, insinuating that the defense had bolstered the victims' testimony and accused the defense of "staging" the victims' testimony.

Petitioner's attorney and the government told the court that they intended to call among other witnesses: (A) for the government: (1) the four alleged victims; (2) 2 to 3 additional alleged victims; (3) Cambodian police personnel present at the time of the search of Petitioner's hotel room; (4) Cambodian police personnel present at the time of statements made by the defendant and statements made by the victims, including interpreters (same as defense #2); (5) Dr. Cousins; (6) AFESIP Personnel (1-3); (7) Golden Bridge personnel (2); (8) Mark Ripen; (9) Commune Village Chief: (B) For the defense: (1) parents of alleged victims; (2) any and all persons present including interpreters at the time of the alleged statements of the defendant and the alleged victims; (3) security personnel at Sharkey's Bar; (4) Cambodian attorney of Kent Frank, Pove Srey Sour; and (5) Cambodian police escort of Kent Frank. (Exhibit 15) (DE #46).

Additionally, Petitioner requested that his attorneys call Attorney Michael Walsh, Attorney Matthew Troccoli, Attorney Lorie Feiler, Celia Frank, Dr. Kevin Frank, Henry Morrison, Brother Tant (Evangelist Minister), Peter Greis, Sao Sarong, Attorney Pove Srey Sour, the alleged victim's parents, security personnel at Sharkey's Bar, Petitioner's Cambodian police escort, Dr. Feraldo, personnel used for obtaining the passports for the alleged victims, and agent Mathews.

Had these witnesses been called at trial, they would have testified to facts that would have resulted in a different outcome. Had these crucial witnesses been called, they would have testified as follows:

**Attorney Michael Walsh** would have testified, among other things, as to the steps he and others had taken in order to obtain the passports for the alleged victims and what steps they took to insure their accuracy; his interview with the girls' parents; the evidence from the clinic they interviewed concerning the questioning and medical treatment of the girls; the police security guards present at the bar where the girls worked as prostitutes and the process the bar security required to insure the girls were over the age of 18; the interview of the employees at the Commune Village who clearly stated that Petitioner was not known at the village; and testimony concerning his interview of Doctor Cousins. Attorney Walsh could have also testified concerning facts directly related to his interview with Dr. Cousins. (Exhibit 16).

**Attorney Matthew Troccoli** would have testified, among other things, about evidence confirming the accuracy of Attorney Michael Walsh's testimony; direct knowledge of the interview with the alleged victim's parents; and other matters concerning Petitioner's arrest in Cambodia. (Exhibit 17).

**Attorney Lorie Feiler** would have testified concerning her trip to Cambodia to investigate and gather evidence concerning the arrest of Petitioner; the treatment of the victims by the Cambodian police; the involvement of the United States authorities from the inception of Petitioner's case.

**Dr. Kevin Frank** would have testified, among other things, that the Petitioner had divested himself of his property and belongings in the United States, made arrangements for Dr. Frank to make Petitioner's child support payments as well as payments for the property taxes for his sons; and would have confirmed Petitioner's assurances that he had moved permanently to Asia. (Exhibit 10).

**Celia Frank** would have testified, among other things, that she and Petitioner had separated in 2002 and that Petitioner had given her half of his properties and placed the other half in trust for the benefit of his two children and informed her of his intentions to move permanently to Asia to start a business and establish citizenship there. Additionally, she would have testified that Petitioner merely returned in October of 2003 to visit his two sons and take them to Universal Studios for Halloween and then return back to Cambodia to his new permanent domicile.

**Henry Morrison** would have testified, among other things, that Petitioner had moved permanently to Asia and had written him on several occasions inviting him to visit Petitioner in Asia. Additionally, Mr. Morrison would have testified that he rented a room to Petitioner for a short time in October of 2003 when Petitioner came to visit his children. (Exhibit 9).

**Evangelist Minister Tant** would have testified that Petitioner had donated many of his personal belongings to the church and relayed his intentions to settle permanently in Asia.

**Peter Greis** would have testified that he was a German citizen with a diplomatic passport living in Cambodia who worked in an advisory capacity with the

25

Cambodian National Police and had personal knowledge that the American Embassy had a part in the arrest of Petitioner and had in actual fact ordered the arrest. Had evidence of American involvement in Petitioner's arrest been presented at the motion hearings, Petitioner would have been entitled to *Miranda* warnings and his alleged confession would have been suppressed.

Agent Matthews was a member of the United States Custom Service (ICE) and could have testified that Petitioner continuously refused to sign a *Miranda* waiver on numerous occasion and that Agent Phillips was involved with the arrest and questioning of Petitioner in the early AM of January 2, 2004, and not at a later date as testified to by Agent Phillips, thereby impeaching the testimony of Agent Phillips. Agent Matthews could have also testified that Agent Phillips ordered the examination and vaginal swabs of the four victims early on January 2, 2004 (Exhibit 18), thereby contradicting Phillips's testimony that the United States government was not involved in Petitioner's arrest.

Sao Sarong was the policeman note taker at the time of Petitioner's questioning in Cambodia and could have testified, among other things, that: Petitioner never admitted to having sex with young underaged girls; that many of the statements attributed to Petitioner by Keo Thea were lies and translated to suit Keo Thea's needs; that Petitioner was forced to answer questions under threat of additional prosecution; that many of the statements in Petitioner's alleged confession were never made by the Petitioner.[2]

---

[2] Failure to call Sao Sarong also violated Petitioner's Constitutional right to confrontation.

**Parents of Alleged Victims** would have testified as to the age of the girls, and could have provided their "Family Book" showing the girls to have been over 18 years old at the time Petitioner had sex with them.

**Security Personnel at Sharkey's Bar** would have testified that only girls over 18 years of age were allowed into the bar and that the alleged victims at all times passed themselves off as being over 18 years old and were regular working prostitutes at Sharkey's bar.

**Cambodian Police Escort of Petitioner** would have testified that Petitioner at all times remained cautious and had told him to be certain that he only introduced Petitioner to girls who were over the age of eighteen (18).

**Attorney Pove Srey Sour** was vital to Petitioner's defense and travelled from Cambodia to the United States and remained more than two weeks to testify on Petitioner's behalf. Attorney Pove Srey Sour had worked with Attorneys Michael Walsh, Matthew Troccoli, Lorie Feiler, Jeffrey Feiler, and others to help gather evidence on Petitioner's behalf. Additionally, Attorney Pove Srey Sour had assisted Petitioner seek business opportunities in Cambodia and was working with Petitioner to get citizenship in Cambodia. Attorney Pove Srey Sour had also assisted the various individuals obtain the passports for the alleged victims. The victims were also known to Attorney Pove Srey Sour, and he was aware that the girls at all times represented themselves as being over the age of 18 years old and were living in their own apartment and of legal age in Cambodia.

**Dr. Feraldo** would have testified as to the difference between Asian women and American and European women and the difference as to stature, size, maturation and development of Asians and to the fact that the "Tanner Scale" cannot be used for Asians. (Exhibit 13).

Petitioner's counsel's failure to call these witnesses caused irreparable harm to the Petitioner and was the cause of Petitioner being unable to present his defense and seriously prejudiced Petitioner's case. It cannot be denied that had Petitioner been able to call these witnesses, the results of the trial would have been entirely different.

Additionally, the government submitted a list of witnesses it intended to call at trial (Exhibit 14, DE #46) and then failed to produce any of them at trial. This action by the government was designed to prevent Petitioner from calling or examining these persons. The government was aware that the testimony from these witnesses would have seriously undermined their case.

Petitioner's counsel was ineffective by failing to insure that these witnesses were available, and when the government failed to produce them at trial, not objecting to the government's failure and requesting a mistrial, special jury instructions, or a delay so Petitioner could call these witnesses.

The failure of the government to call witnesses who were in its employ and/or who had direct contact with petitioner after submitting them in their witness list, gives the jury the right to infer that the testimony of such witnesses would be unfavorable to the government's theory of the case. Attorneys Feiler and Berger

should have brought this failure on the part of the government to the attention of the court and the jury and requested special jury instructions regarding this highly relevant point. Their failure to do so prejudiced the petitioner and was ineffective representation.

In *United States V Pitts, 286 U.S. App. DC, 918 F.2d 197*, the court held "where a person, who has so much to offer at trial that one would expect them to testify, does not appear, and one of the parties has a special ability to produce them, the jury is permitted to draw the inference that the missing witness(es) would have testified adversely to that party and the court may instruct jury on drawing inferences." This finding is clearly established federal law and followed in the Eleventh Circuit. See, *Graves V United States, 150 U.S. 118, 121, 14 S.Ct. 40, 37 L.ed 1021 (1893): United States V Nahoom. 791 F.2d 841, 846, (11th Cir. 1986): Cannon V United States, (2007 U.S. Dist. Lexis 95649)(S.D. Fla. 2007)*. The request for these special jury instructions was vital to petitioner's defense.

Petitioner submits that had these witnesses been available at trial, Petitioner could have elicited the following favorable testimony:

**Han Thi Nguyen (Minor A) and Diem Thi Nguyen (Minor C)** would have testified as Dieu did, as to them being over the age of 18 when they engaged in sexual relations with Petitioner, and that the police and NGO (AEFSIP) beat them and offered them money to testify that they were under 18 years of age. Had they offered such testimony, Petitioner would not have been convicted in the same way he was not convicted with Dieu in counts 3 and 7.

**Additional Alleged Victims**. The government, after promising to introduce Savanny Ly as another alleged victim in it's opening statement, elected to not to produce her at trial. The government was aware that Petitioner would demonstrate to the jury that Savanny Ly had married her husband, Mark Ripin, while she was a minor and was testifying because the government had agreed not to prosecute her husband in exchange for her testimony (Mark Ripin is also an American expat that the government "chose" not to prosecute).

**Cambodian Police Personnel** who were present at the time of the search of Petitioner's apartment would have testified that neither the landlord nor the owner ever gave permission for the search and that the chain of evidence was compromised. The search and subsequent interrogation was videotaped and their testimony would have impeached Keo Thea's perjurious testimony.

**Cambodian Police Personnel** who were present at the time of Petitioner's interrogation would have testified that Keo Thea tore up the first draft of the alleged confession and then forced Petitioner to sign an unfinished version and promised that Petitioner would only need to pay a small fine. Keo Thea never read the revised version to the Petitioner.

**Dr. Cousins** could testify that Gary Phillips had brought the alleged victims to him for examination in the early morning hours of January 2, 2004 and that an assistant wrote a report according to what Agent Phillips wanted written. This testimony would have served to impeach Agent Phillips and proven the involvement of the United States government in the investigation.

**Owners and Personnel of Golden Bridge** could have testified that they did not give permission for the police to enter Petitioner's apartment and that the search was invalid. Additionally, they could have testified that Petitioner had rented a fulltime apartment and was working on obtaining citizenship and that the Golden Bridge Hotel was several doors down the street and that Keo Thea's testimony was untruthful because Petitioner stayed at the backside of the apartments and there were no windows to the street as Keo Thea testified.

**Mark Ripin** would have testified that he was the husband of Savanny Ly. Petitioner's counsel would have been able to illicit testimony from him that he had 'coached' Savanny Ly as to what to say at trial, and that he had made a deal with Agent Phillips. Petitioner could have produced evidence that Mark Ripin was a drug addict and was receiving checks from the United States government through SSI.

**Commune Village Chief** could have testified that the alleged victims were over the age of 18 and renting an apartment and living together as adults.

**Dr. Haber, Dr. Tanner and Dr. Goldberg** would have testified to the materials set forth in Petitioner's "Notice of Disclosure of Expert Witnesses." (Exhibit 15, DE 131).

The failure of Petitioner's counsel to call these vital witnesses, or insure their appearance at trial, seriously prejudiced the Petitioner and changed the entire complexion of the proceeding.

Petitioner was entitled to have his witnesses called to testify in order to show that he had in fact moved to Cambodia with the full intention of remaining there.

Whether Petitioner "traveled" in foreign commerce for the purpose of engaging in illicit sexual conduct with a minor, was a matter for the jury to decide <u>after</u> being presented with <u>all</u> the facts. Attorney Feiler's failure to call these vital witnesses seriously prejudiced the Petitioner and prevented Petitioner from being able to present his evidence to the jury. <u>See</u>: ***United States V Jackson***, *480 F.3d 1014 (9th Cir. 2005).*

There is no question that Attorneys Feiler and Berger rendered ineffective assistance of counsel when they failed to call several key witnesses that were available and willing to testify concerning relevant issues that would have provided the jury a different perspective of the facts in Petitioner's case. Failure to call witnesses constitutes ineffective assistance of counsel when it deprives a defendant of a substantial defense. When making strategic decisions, counsel's conduct must be reasonable; here it was not. <u>See</u>: ***Roe V Flores-Ortega***, *528 U.S. 470, 481, 120 S.Ct. 1029 (2000).*

The jury was entitled to hear the testimony from these witnesses and decide the case based on all facts. The validity of any and all information is for the jury to decide. Not the prosecutor, attorney, or even the judge.

### B) TRAVEL ISSUE AS TO COUNT 10

In 2002, Petitioner gave fifty (50) percent of his home in Miami Beach to his wife and placed the other fifty (50) percent in trust for his two sons. Petitioner then sold most of his possessions and donated the major portion of what remained to his church. (Exhibits 7, 8, 9, & 11). Petitioner then purchased a <u>one-way</u> ticket to Asia,

and moved permanently to Asia in order to establish a business there. Petitioner proceeded to hire a business consultant; rent a full time apartment; open two bank accounts; purchase an automobile; began complying with his residency requirements and took out a business visa.

In October of 2003, Petitioner contacted his two sons in the United States, and at their pleading, agreed to come to the United States to visit them and take them to the Universal Studios Halloween extravaganza as he had done in previous years. (Exhibits 7, 8, 9 & 11).

Petitioner purchased a round trip ticket from Asia to the United States and back. Upon arrival in the U.S., Petitioner was forced to rent a temporary room from a friend because he no longer lived in the United States. (Exhibit 9). After spending time with his children, Petitioner returned home to Asia.

During the trial Petitioner pleaded with his attorneys to call his wife and kids to testify; the friend at who's home he stayed to testify; as well as his brother and the reverend from his church to testify, in order to prove that his move to Asia was permanent and that he had not traveled from the United States in foreign commerce for the purpose of illicit sex with a minor. (Exhibits 7, 8, 9, 10 & 11 ). However, Petitioner's attorneys told Petitioner that it would be a waste of time and only serve to anger the judge, and that the judge had already "made up his mind".

The relationship between the mens rea and the actus reus required by 2423(b) is neither incidental nor tangential. Section 2423(b) does not simply prohibit traveling with an immoral thought, or even amorphous intent to engage in sexual

activities with a minor. The travel must be <u>for the purpose</u> of engaging in the unlawful sex act. <u>See</u>: ***United States V Howard***, *359 F.3d 631, 638 (3rd Cir. 2004).* (Emphasis added). Petitioner's return trip to Cambodia where he was living certainly does not qualify, or meet that standard. Petitioner was merely returning home.

There can be no question that Petitioner's "domicile" at the time of his travel to the United States was in Asia. "Domicile" is a concept widely used in many areas of law. <u>See</u>: ***Choctaw Indians V Holyfield***, *490 U.S. 30, 43, 109 S.Ct. 1597 (1989).* It is generally understood to mean the place where an individual establishes both physical presence and an intent to remain indefinitely. <u>See</u>: ***Texas V Florida***, *306 U.S. 398, 424, 59 S.Ct. 563, 576 (1939).* "Lawful domicile" means, at least, the simultaneous existence of lawful physical presence and  lawful intent to remain indefinitely. ***Melian V INS***, *987 F.2d 1521 (11th Cir. 1993).* The idea that "travel" can go on indefinitely, even if a citizen permanently resettles abroad, simply does not comport with the common usage of the term "travel."

1-3)  COUNSEL WAS INEFFECTIVE WHEN HE 'INVITED THE COURT' TO COMMIT SEVERAL CRITICAL ERRORS AT TRIAL.
A) ASKED JUDGE TO READ CONFESSION.
B) AGREED TO GOVERNMENT'S FINAL TRANSLATION OF THE ALLEGED CONFESSION.
C) INVITED RULE 30 VIOLATION OF JURY INSTRUCTIONS.

At trial, Petitioner's Attorneys moved the court into making several errors that seriously prejudiced Petitioner and caused the jury to render a fundamentally unfair verdict in Petitioner's case.

## A) JUDGE'S READING OF THE CONFESSION

Petitioner's attorneys asked the judge to read the government's final translated version of Petitioner's alleged confession from Cambodia to the jury. This was done over the objection of the Petitioner and created the unacceptable possibility that because the judge read the confession, it was in fact correct. Even though the judge gave cautionary instructions to the jury, this error undoubtedly prejudiced the jury into believing the confession was true as read. The fact that the judge even had to give cautionary instructions demonstrates the high risk and likely prejudicial outcome of its introduction. Besides the question of accuracy and correctness, the point here is that it was ineffective assistance of counsel for the Petitioner's own defense counsel to offer its introduction to the jury under such prejudicial risks; when in fact counsel should have been taking the necessary legal steps to oppose its introduction.

Over Petitioner's objection, the court admitted a "testimonial statement" from the Petitioner that was purportedly given during "custodial interrogation" written by police officer Sarong, and translated by individuals who did not testify at trial, in violation of Petitioner's constitutional confrontation right, and Petitioner's attorneys never objected nor protected Petitioner's rights, and allowed the judge to read the unchallenged statement to the jury (TT 2547-2549)(TT 2360-2361).

It has been repeatedly emphasized that the words a judge says, particularly to a jury, are very important. The Supreme Court has explained "the influence of the trial judge on the jury is necessarily and properly of great weight, and jurors are

ever watchful of the words that fall from him." *Bollenbach V United States, 326 U.S. 607, 66 S.Ct. 402 (1946).* Petitioner's attorney failed to protect his interest.

## B) THE GOVERNMENT'S FINAL TRANSLATION OF THE ALLEGED CONFESSION.

Petitioner's attorneys agreed to the government's final translation of the purported confession, denying Petitioner his constitutional right of confrontation, thereby removing the issue of credibility from the jury.

Throughout the trial, Petitioner strongly denied ever having made the confession or the various statements as introduced by the government and as testified to by Keo Thea. Petitioner informed his attorneys on several occasions that the police note taker needed to be called to testified in order to get to the truth of the matter, Petitioner repeatedly asked his attorney to challenge the government's version of the translation. While assuring Petitioner that he would make the required challenge to the confession, Attorney Feiler failed to challenge the accuracy of the government's English translation, although he had no idea of the person responsible for doing the translation. In fact, over Petitioner's objection, counsel told the court that there were no objections to the government's version of the translation even though Petitioner had emphatically informed his counsel over and over again that he had <u>NOT</u> made the statements attributed to him by the government's version of the translation (TT 2373-2376).

## C) RULE 30 VIOLATION ISSUE

Petitioner's attorneys "invited" a Rule 30 violation when, after closing arguments and in the middle of jury deliberations, the jury became confused and requested clarification of the jury instructions, Petitioner's counsel requested, and permitted, the court and the government to change and broaden the previous jury instructions and allowed the jury to find Petitioner guilty by omitting vital elements of the crime. This was done over the strenuous objections from the Petitioner. A defendant can invite error by submitting an incorrect jury instruction to the district judge which is then given to the jury. *United States V Stone, 139 F.3d 822 (11th Cir. 1998)*. This egregious error was neither agreed to by the Petitioner, nor submitted by him, but was a serious error on the part of Petitioner's counsel.

Petitioner's counsel performed deficiently when he failed to object to the improper jury instruction after the jury had begun deliberating, and in fact invited the error by suggesting revised instructions to the judge and permitting the government to modify the instructions thereby allowing the jury to convict Petitioner without requiring proof of all the elements of the crime.

This failure to object and inviting of the erroneous instruction seriously prejudiced Petitioner. There is a reasonable probability that the outcome of the trial would have been different if the jury had been properly instructed.

In *United States V Buculei, 262 F.3d 322 (4th Cir. 2002) cert denied 535 U.S. 963*, the court held that 18 U.S.C. 2251A was about 'CONTROL'. The jury in the instant case found that no evidence was introduced regarding Petitioner's specific

intent to control the alleged victims and found the Petitioner NOT guilty of control. The exclusion of the control element from the jury instruction was error, and counsel's failure to object to the failed jury instruction constituted deficient performance. *Sandstrom V Montana*, *442 U.S. 510, 99 S.Ct. 2450 (1979)*. It is clear that the trial judge only broadened the required elements from the offense in order to derive the amended instructions *United States V Stone*, *139 F.3d 822 (11ᵗʰ Cir. 1998)*.

The supplemental instructions by the judge was plainly erroneous because it misstated the law by instructing the jury to find Petitioner guilty if it found he was guilty of either purchase or control, when clearly established federal law holds that guilt under 18 U.S.C. 2251A is about control. Attorney Feiler failed to object to the instruction and in fact invited the error.[3] The Supreme Court has held "the judge's last word is apt to be the decisive word. If it is a specific ruling on a vital issue and misleading, the error is not cured by a prior unexceptionable and unilluminating abstract charge."

### 1-4)  COUNSEL WAS INEFFECTIVE FOR HIS FAILURE TO TIMELY FILE MOTIONS.
   A) DR. FERALDO ISSUE
   B) RIGHT OF CONFRONTATION – TRANSLATOR – POLICEMAN NOTE TAKER.
   C) BILL OF PARTICULARS – (16 VS 18).

Before trial, the trial judge set several deadlines for the filing of motions for both the government and the defense. While the government complied with the

---

[3] See: *United States V Frank*, *599 F.3d 1221, 1240 (11ᵗʰ Cir. 2010)*. "Frank invited error when he not only agreed with the supplemental instructions and special verdict form, but requested them."

court's orders and timely filed its motions and requested reciprocal motions or objections from the defense counsel, Petitioner's attorneys failed to file several vital motions challenging the government's witnesses and for the introduction of defense expert witnesses, and Petitioner's right to confrontation, and right to challenge the government's version of the English translation of Petitioner's alleged statements in Cambodia. These motions would have provided important rebuttal to the government's witnesses.

## A) EXPERT WITNESSES ISSUE

At trial, Petitioner had several expert witnesses that were prepared to testify in order to challenge the government's witnesses and testify on Petitioner's behalf. Among these witnesses were Dr. Tanner, Dr. Haber, and anthropologist Dr. Monica Feraldo.

The trial judge excluded the motion for Dr. Feraldo on timeliness grounds, relying on *United States V Petrie, 302 F3d 1280 (11th Cir. 2002).* The judge had given attorneys Feiler and Berger ample time to file the motions, and required expert testimony by October 20, 2006. Petitioner's attorneys were not only late, but in the words of the judge were "seriously late." (TT 2849). The attorneys were also late in their disclosure for Dr. Rosenbloom (TT 2850). The government made the statement that the attorneys' failure to comply with so many deadlines "shows a very cavalier attitude towards the discovery rules on experts." The judge, while excluding the defense motion for defense expert witness stated to the defense counsel "the fact is, the motion was late" (TT 2989-2991). The tardiness of the filing

of the motions allowed the government to argue that it had been "severely prejudiced" and that the "rules have been violated by defense with no reason." (TT 2845, L7-22).

Also at pretrial hearing, the judge, while stating, "Mr. Frank has not responded to the motions in two months...", granted the government's request to deny Petitioner's motion for permitting Dr. Haber's testimony at trial. (HT pg 9/DE 164).

These serious violations by Petitioner's counsel, severely prejudiced Petitioner and prevented him from presenting his expert witnesses in rebuttal to the government's expert witnesses.

## B) CONFRONTATION ISSUE

Throughout the entire proceedings, Petitioner staunchly argued the facts concerning his alleged confession and the statements made when he was initially arrested in Cambodia. Petitioner on numerous occasions told his attorneys that the translation and depiction of his alleged statements had been changed and incorrectly translated and that the policeman note taker and the person responsible for the translation from Cambodian into English should be called to testify in order to properly challenge the veracity of the documents and the testimony of Keo Thea and Gary Phillips. Petitioner's attorneys however, failed to require the government to produce these vital witnesses and thereby violated Petitioner's Sixth Amendment compulsory process and confrontation rights. The proper cross examination of these witnesses would have permitted Petitioner to demonstrate the inconsistencies of the

government's witness to the jury and would have likely resulted in a different outcome to Petitioner's case.

Petitioner's counsel failed to protect Petitioner's confrontation rights and failed to file motions to exclude the government's English translated version of Petitioner's purported confession. In Petitioner's case, Petitioner's alleged statement was derived from custodial interrogation by law enforcement. The statement was written by police officer Sao Sarong in the Khmer language. Both the author and the person who translated the Khmer version into English did not testify. Petitioner had a constitutional right to confront the parties responsible for authoring and translating the alleged statements made by the Petitioner. Petitioner's attorneys had the responsibility to file the necessary motions to protect Petitioner's confrontation rights.

"Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the constitution actually prescribes: confrontation" *Crawford V Washington, 541 U.S. 36, 68-69, 124 S.Ct. 1354 (2004).* It is reasonable to infer that had Petitioner been able to cross-examine the police note taker, who was present at the interrogation, fully about the truth of the events as they actually took place, the witness's credibility could have been completely eviscerated.

Attorney Feiler simply conceded to the introduction of the government version of the confession over the objection from Petitioner and the conflicts in the

41

translation. This error was the cause of Petitioner not being able to challenge the translation, and seriously prejudiced the Petitioner.

## C) BILL OF PARTICULARS ISSUE

Petitioner repeatedly asked his attorneys to file for a bill of particulars in order to determine what facts the government intended to prove at trial. Petitioner's attorneys failed to file the requested motion, and thereby allowed the government to introduce evidence on both prongs of 18 U.S.C. 2423(c) (F1 & F2) and to proceed on an unconventional description for the term purchase. As a result, Petitioner's attorneys were ill prepared to effectively defend Petitioner and argue the meaning of the statute to the jury.

## 1-5) COUNSEL WAS INEFFECTIVE WHEN HE ERRONEOUSLY INFORMED PETITIONER CONCERNING PETITIONER'S RIGHT TO TESTIFY, AND RIGHT TO INTRODUCE POLYGRAPH RESULTS.

Prior to trial and the suppression hearing, Petitioner pleaded with his attorney to permit him to take a polygraph test in order to demonstrate to the court that he was telling the truth concerning his alleged confession and the events in Cambodia. Petitioner's attorney misadvised and erroneously told Petitioner that polygraph evidence and results could not be used at the suppression hearing. Petitioner additionally requested that he be allowed to testify on his own behalf at the suppression hearing. Petitioner's attorney again misadvised and erroneously told Petitioner that if he elected to testify at the hearing, Petitioner would be giving up his constitutional rights against self incrimination and that anything he said at the

42

suppression hearing could ultimately be used against him at trial by the government.

## A) POLYGRAPH ISSUE

The crux of Petitioner's case rested on three very important issues:

1) The alleged confession by the Petitioner in Cambodia; 2) Petitioner's belief that the alleged victims were over the age of eighteen (18) when he engaged in sexual relations with them; and 3) whether Petitioner traveled to Cambodia "for the purpose" of engaging in illicit sexual relations with a minor.

Petitioner was seriously prejudiced by his attorney's misadvice concerning his right to testify or to present polygraph evidence. On several occasions the judge entered his rulings because he did not have all the facts before him and alluded to the fact that he had not heard from the Petitioner. The judge stated; "Your client (Petitioner) has not testified at any hearing. I have not received any evidence right now contrary to the testimony of Captain Keo Thea and Mr. Seng with regard to what happened at the interview" (TT 2384, L5-8), referring to Petitioner's alleged statement in Cambodia. Thereafter, the judge admitted the testimony into evidence (TT 2392, 2393).

Had Petitioner's counsel allowed Petitioner to submit to the requested polygraph test, the judge would have had direct evidence supporting Petitioner's contention that he had not in fact made the statements that Captain Keo Thea attributed to him. Again, when reaching a decision on the motions, the judge stated that he had heard nothing from Petitioner (TT 2363, L18-20).

Had defense counsel permitted Petitioner to take the requested polygraph test, the court would have had the testimony from the Petitioner and Petitioner may have been permitted to later introduce the results of the polygraph to the jury.

In *United States V Johnson*, *816 F.2d 918 (3rd Cir. 1987)* the court held that polygraph evidence could be used to rebut a defendant's assertions of a coerced confession. Many other circuits including the Eleventh Circuit, have ruled that polygraph evidence is admissible to impeach or corroborate testimony. *United States V Piccinonna*, *885 F.2d 1529 (11th Cir. 1989)*; *Tyler V United States*, *193 F.2d 24 (DC Cir. 1951)*; *United States V Kampiles*, *609 F.2d 1233 (7th Cir. 1979)*; *United States V Johnson*, *supra, United States V Perkles*, *2010 U.S. App.Lexis 11827, (11th Cir. 2010)*. The Eleventh Circuit has admitted the use of polygraph evidence under two specific conditions: (1) when the parties stipulate in advance as to the test's circumstances and the scope of its admissibility, or (2) "to impeach or corroborate the testimony of a witness at trial" *United States V Piccinonna*, *885 F.2d 1529, 1535-36 (11th Cir. 1989)(en banc)*. Petitioner was entitled to offer testimony to rebut the government's witness Captain Keo Thea's false assertions that his contemporaneous confession was voluntary. The government's extraordinary allegations that Petitioner had admitted knowledge of the victims being under age, made the polygraph extremely relevant to the interview. The evidence regarding the polygraph would have gone a long way towards challenging the credibility of the government's witnesses. The test would have been relevant to the progression of events both preceding and during the Cambodian Police taking of the alleged

44

confession, and would have lent credence to Petitioner's testimony that he had not confessed nor admitted to having knowledge of the girls being underage and that he continually requested an attorney as well as the fact that he had permanently moved to Asia.

The holdings of various circuits find that testimony concerning a polygraph examination is admissible where it is not offered to prove the truth of the polygraph results, but instead is offered for a limited purpose such as rebutting a defendant's assertion that his confession was coerced. See: *Kampiles, supra @ 1244-45; Tyler, supra; Johnson, supra @ 928-24.*

In *United States V Thevis, 665 F.2d 616, 637 (5th Cir. 1982)* the court held that Rule 403 was not offended by the admission of testimony relating to polygraph examinations when it is not admitted to establish the truth of the statements made as part of the examination. Additionally, the Ninth Circuit in *United States V Miller, 874 F.2d 1255, 1261 (9th Cir. 1989)* the court noted that "polygraph evidence might be admissible if it is introduced for a limited purpose that is unrelated to the substantive correctness of the results of the polygraph examination."

Petitioner was seriously prejudiced by counsel's failure to permit him to take the requested polygraph test. Counsel's errors cannot be attributed to any strategic decisions, especially considering the fact that the trial judge and the magistrate judge continually alluded to the fact that they heard no testimony from Petitioner. Had Petitioner been allowed to take the polygraph test, there is a reasonable

probability that the court may have ruled differently on several of Petitioner's motions and the results of the proceedings may have been different.

## B) RIGHT TO TESTIFY AT SUPRESSION HEARING

The Supreme Court has held that the Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense" *Holmes V South Carolina, 547 U.S. 319, 324, 126 S.Ct. 1727 (2006)*. Several times throughout the trial at motion hearings the judge alluded to the fact that he had not heard any testimony from Petitioner (See argument 5A supra). Petitioner repeatedly asked his counsel to permit him to testify at the suppression hearing. Counsel not only refused to allow Petitioner to testify, but clearly told Petitioner that if he continued to insist on testifying, he would do so at his own "peril".

Counsel further told Petitioner that if he elected to testify at the suppression hearing, he would be forfeiting his right against self incrimination and that the government could then use anything he said against him at trial, and that the government would use Petitioner's statements and "turn them around" against Petitioner. Petitioner, knowing nothing about the law, believed the misadvice of counsel and gave up the notion of informing the judge that he wanted to testify at the suppression hearing.

Petitioner submits that his counsel was ineffective for not allowing him to testify in his own defense. Counsel incorrectly advised petitioner of his rights with regards to the decision to testify or not testify. This misadvice seriously prejudiced Petitioner. Had Petitioner testified at the hearings, there is a strong possibility that

the outcome of the trial would have been different. See: *Chandler V United States*, *218 F.3d 1305 (11th Cir. 2000)*.

Due process requires that there first must be a reliable determination of any disputed facts regarding the voluntariness of any statements by the accused and that this determination must be unaffected by the truth of the statement or the guilt of the accused. For this reason, the jury must not be left to resolve factual disputes affected by the content of the statement until the trial judge, or another judge, has initially found the statement to have been made voluntarily.

Additional purposes served by such a preliminary hearing are those of granting the defendant an opportunity to testify in respect of his statement without being compelled to take the stand in his defense. This mandate is applicable to federal courts as a component of Fifth Amendment due process. Unquestionably, a voluntariness hearing must afford the defendant an opportunity to testify regarding the inculpatory statement out of the jury's presence without prejudice to his right not to take the stand in his defense. See: *United States V Carignan*, *342 U.S. 36, 72 S.Ct. 97 (1951)*.

Petitioner's counsel lied to Petitioner and was ineffective by not permitting Petitioner to testify at the motion hearing, thereby preventing Petitioner from addressing the court and offering testimony on his own behalf.

## 1-6) COUNSEL WAS INEFFECTIVE WHEN HE FAILED TO OBJECT TO THE GOVERNMENT'S INTRODUCTION OF STIPULATED EVIDENCE TO WHICH THE GOVERNMENT HAD AGREED NOT TO PRESENT.

Prior to trial, Petitioner's trial counsel submitted a motion to withdraw expert witness Dr. Tanner and Dr. Feraldo from testifying at Petitioner's trial concerning the government's use of the 'Tanner Scale' and in determining the ages of the alleged victims (DE 161). Based on the government's assurance that the 'Tanner Scale' would not be used, Petitioner's counsel agreed with the government to withdraw Petitioner's expert witnesses (DE #161). At trial however, the government's witness, Dr. Lambert, admitted that he relied on the "Tanner Scale" in order to determine the ages of the alleged victims (TT 2717, L22). Petitioner's attorneys, rather than move for a mistrial and/or the redaction of the government witness's testimony, just agreed to simply question Dr. Lambert concerning the 'Tanner Scale' comparisons, when in fact they were neither prepared nor acquainted with the studies and facts concerning the use of 'Tanner Scale' criteria as applied to Asian women, photographs, and underdeveloped countries (TT 2714-2719). This egregious error on defense counsel's part seriously undermined the finding of the jury and prejudiced the Petitioner.

While the 'Tanner Scale' can be properly used to determine the sexual maturation of a person, it is not reliable for the purpose of estimating specific chronological age. See: *United States V Rodriguez-Pacheco*, 475 F.3d 434 (1st Cir. 2007).

Additionally, in the *Official Journal of the American Academy of Pediatrics, 1998*, Dr. Tanner himself, in a letter addressed to the journal, states that "*Chronologic age cannot be accurately determined via Tanner staging. Therefore,*

*physicians should refrain from testifying in court as to chronologic age based on Tanner staging."*

Furthermore, Dr. Timothy J. Kutz, MD, <u>Department of Pediatrics, University of Utah School of Medicine</u>, makes it clear that: *"It is also understood that Tanner staging does not apply to populations not educated and described by Dr. Tanner;"* and that *"Tanner staging does not apply to populations not evaluated by Tanner, particularly those that may have sparse pubic hair, on which much of the staging depends, such as Asians."* (Exhibit 13).

These scientific studies were published in 1998 & 1999 and were available to defense counsel at trial, however, they were not prepared for the surprise of having to question Dr. Lambert concerning Tanner staging, and neither requested time from the court to prepare, nor moved for a mistrial based on the government's assurance that their witness would not rely on the Tanner Scale.

Petitioner was left to the mercies of incompetent counsel who were unprepared and not familiar with Tanner staging. Furthermore, defense counsel failed to prepare a report concerning what the defense expert witnesses would testify to in order to challenge the government's expert witness's ability to testify as to the age of the alleged victims based on photographs as a matter of law, even though there existed a plethora of studies and case law on this very important issue.

Attorney Berger objected to Dr. Lambert's ability to testify about the age of the alleged victims based on photographs. When the judge asked Attorney Berger for case law to support the objection, Berger simply said he had none (TT 2691-2693).

The trial judge even questioned defense counsel Berger as to why he had not prepared an expert report when he asked:

JUDGE:     "You don't have an expert report from your expert already?"

BERGER:   "No, Your Honor."

JUDGE:     "Why not?"

BERGER:   Why don't I have an expert report?"

JUDGE:     "Yes."

BERGER:   "In this particular case... we originally..."

JUDGE:     "If it goes to the issue of Dr. Lambert's supposed inability to testify on this area, because people in this field do not do it, and cannot do it, why don't I have something from you to tell me that?" (TT 2694, L7-22).

The government's counsel Wendy Waldron countered by stating:

"The defense's... one or two page motion to exclude had no support and still does not have any support." (TT 2697, L5-7)

Defense counsel rendered ineffective assistance and seriously prejudiced Petitioner's ability to possibly exclude the government's witness, Dr. Lambert's testimony, when in fact there existed a mountain of information and case law concerning this issue.

### 1-7)  COUNSEL WAS INEFFECTIVE WHEN HE FAILED TO OBJECT TO THE PROSECUTOR'S MISCONDUCT AND MOVE FOR A NEW TRIAL. A) OPENING STATEMENTS. B) CLOSING ARGUMENTS.

Petitioner contends that his trial attorney was ineffective when he failed to object to several instances of prosecutorial misconduct during opening statements and closing arguments, and failed to move for a mistrial.

The government made disparaging and derogatory comments about Petitioner; made statements of personal opinion; and made arguments regarding facts not in evidence. See: *Chavez V Crawford*, *2010 App. Lexis 12669 (June 21, 2010)*.

Additionally, throughout the entire trial, the prosecution continued to allude to events that took place in Cambodia more than three years prior to Petitioner's trial. Petitioner however, was never permitted to address his trial in Cambodia and reveal the favorable facts of the events that took place. This left the jury to speculate as to what had taken place in Cambodia, and whether Petitioner was guilty of other crimes that were not revealed at trial. The prosecution actually made continuous insinuations of prior bad conduct (when in fact Petitioner was previously exonerated in Cambodia), in order to mislead the jury into thinking that it had already been determined that the Petitioner was guilty of some bad conduct. This was egregious misconduct and gave the jury the impression that the Petitioner was already a "known sex offender" when no such conclusion had ever been made. Petitioner's counsel was derelict in not objecting and moving for a mistrial.

With more than three years having passed since the events in Cambodia, the jury could have easily surmised that the Petitioner had been found guilty of the crimes testified to by the government witnesses and had served time in a Cambodian prison before being brought to stand trial in the United States. Many of the comments made by the prosecutor at opening arguments could have been construed as indicating that the prosecutor knew defendant was involved in other criminal conduct, which defense counsel was not able to rebut at trial. Such

comments deprived Petitioner of a fair trial. Petitioner's counsel's failure to object to the introduction of these highly prejudicial statements without the Petitioner having the right to confront these witnesses, nor the opportunity to produce any witnesses to rebut these malicious statements, and without any objections from Petitioner's counsel, clearly violated Petitioner's due process rights. This egregious misconduct was designed by the prosecutor to taint Petitioner's character, through guilt by inferences, without having to produce a witness they knew would undermine their case. While the prosecutor's attempt to discredit Petitioner's "dolphin" self-portrait may have been at the root of these highly prejudicial statements, the methods they chose to accomplish this, however, were improper and requires reversal of Petitioner's conviction. Counsel's failure to object to all these highly prejudicial statements was ineffective and fell far below the standard of competency required by the Constitution.

In evaluating counsel's performance and the prosecutor's statements, this Court must examine the statements "in the context of the trial as a whole and assess their probable impact on the jury." *United States V Hernandez, 145 F.3d 1433, 1438 (11th Cir. 1998).* "A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would be different." *United States V Wilson, 149 F.3d 1298, 1301 (11th Cir. 1998).*

Defense counsel has a responsibility to forestall unfair provocation and object to prosecutorial statements that are intended to inflame and bias the jury. Additionally, it is the district court's responsibility to forestall an unfair provocation

and to constrain prosecutorial misconduct. <u>See</u>: ***United States V Sigal***, *341 F.2d 837, 845 (3rd Cir.) cert denied, 382 U.S. 811, 86 S.Ct. 23 (1965),* (where there is blatant deviation from acceptable standards, prompt intervention by the district court is clearly in order). Here, except for the single comment regarding child pornography, both the court and counsel failed to intervene, causing extreme prejudice to Petitioner.

In ***Berger V United States***, *295 U.S. 709 (1935)* the Supreme Court made it abundantly clear that "improper suggestions, insinuations, and especially assertions of personal knowledge, are apt to carry much weight against the accused when they should properly carry none."

"A prosecutor must refrain from improper methods calculated to produce a wrongful conviction." It is well established that the only purpose of closing argument is to help the jury in evaluating the evidence. ***United States V Pearson***, *746 F.2d 787, 796 (11th Cir. 1984); **United States V Dorr**, 636 F.2d 117, 120 (5th Cir. 1981).* "A prosecutor is... forbidden to make improper suggestions, insinuations and assertions calculated to mislead the jury" and may not appeal to the jury's passion or prejudice. ***United States V Phillips***, *664 F.2d 971, 1030 (5th Cir. 1981) cert denied, 457 U.S. 1136, 102 S.Ct. 2965 (1982).* Moreover, we have not here a case where the misconduct of the prosecutor was slight or confined to a single instance, but one where such misconduct was pronounced and persistent, with a probable cumulative effect upon the jury which this Court cannot disregard as inconsequential.